Matter of Alexis Angelica D. (2007 NY Slip Op 52310(U))

[*1]

Matter of Alexis Angelica D.

2007 NY Slip Op 52310(U) [17 Misc 3d 1136(A)]

Decided on September 4, 2007

Family Court, Kings County

Danoff, J.

Published by New York State Law Reporting Bureau
pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on September 4, 2007

Family Court, Kings County
In the Matter of the
Commitment of Alexis Angelica D. A Child Under Eighteen Years of Age Pursuant to Section
384-b of the Social Services Law of New York State
B-20188/05

APPEARANCES:
Angelique I. Segarra, Esq., for the Petitioner
Wingate, Kearney & Cullen
Attorneys at Law
32 Court Street
Brooklyn, NY 11201-9243
Danuta Jegorow, Esq., for the Respondent father
112 Madison Avenue, Tenth Floor
New York, NY 10016
Jameelah Hayes, Law Guardian for the Child
The Legal Aid Society/Juvenile Rights Practice
111 Livingston Street, Eighth Floor
Brooklyn, NY 11201

Susan S. Danoff, J.
In this proceeding for the termination of parental rights, this Court is faced with unusual
[*2]circumstances and an unusual request. The Respondent father
in this matter asks if he may have
visitation with his daughter if she is adopted after his parental rights are terminated.
The Respondent father was identified by the Respondent mother as the child's father. However,
his name does not appear on the birth certificate of the child; he never sought to acknowledge his
paternity nor file for an order of filiation; and he did not register with the Putative Father
Registry. His relationship with his daughter has been limited solely to visitation. During the
infancy of child ALEXIS, the Respondent father alleges he saw the child daily, changed her
diapers, fed her, and took her to her doctors appointments. On October 28, 2001, when the child
was two and one-half years old, the Court removed the child to the care and custody of the
Commissioner of Social Services, which placed her with HeartShare Human Services of New
York (hereinafter the "Agency") after the Respondent mother was arrested. Thereafter, the
Respondent father had supervised visitation with the child twice weekly for two hours at the
Agency until he was permitted to have unsupervised visitation set up with the foster parent. The
Respondent father did not file for custody or offer a resource for the child. At the fact finding
hearing on the Respondent father's case, the Respondent father testified that he and the
Respondent mother were boyfriend-girlfriend and his wife, now of nineteen years, was at first
kept in the dark about the relationship and about the child's existence. Once the Respondent
father told his wife about the child, the wife would not consent to the Respondent father's
bringing the subject child into her home. The Respondent father maintained that it was his
understanding that after the Respondent mother completed drug treatment and parenting skills,
the Agency would return the child to her.
On July 20, 2005, the Agency filed a Petition for the termination of the parental rights of the
Respondent mother and the Respondent father. The petition charged each respondent parent with
permanent neglect alleging they each had failed for a period of more than one year since the
subject child was in the care and custody of the Commissioner and/or the Agency to substantially
and continuously or repeatedly maintain contact with or plan for the future of the subject child
pursuant to Social Services Law (hereinafter "SSL) § 384-b [7], asserting the Agency had
made diligent efforts to encourage and strengthen the parental relationship. In addition, the
Respondent father was charged with the abandonment of the subject child for the six months
period prior to the initiation of the petition, pursuant to SSL § 384-b [5].
At issue is whether the Agency has proven by clear and convincing evidence that the
Respondent father has permanently neglected the child as defined in SSL § 384-b [7] and
whether, if the Court determines it is in the best interest of the child to terminate the parental
rights of a father who visited his child regularly, the Court can order the Agency to continue to
permit the father to visit the child even after the child is adopted.
Based on the documentary and testimonial evidence, the Court hereby determines the
Petitioner proved by clear and convincing evidence that the Respondent father permanently
neglected the child, pursuant to SSL § 384-b in that for a period of one year prior to the
filing of the petition, he evinced his intent to forego his parental rights by failing to plan
realistically for the child's future. Although the Respondent father has maintained contact with
the child, he has failed to plan for the future of the child. A court can enter a finding of
permanent neglect based on a parent's failure to maintain contact or to plan realistically
for the child's future. SSL § 384-b [7]. "A default in performing either may support a
finding of permanent neglect." (Matter of [*3]Star Leslie
W., 63 NY2d 136, 142-143 [1984]). (See Matter of Orlando F., 40 NY2d 103, 110
[1976]). "[T]he planning requirement contemplates that the parent shall take such steps as are
necessary to provide a home that is adequate and stable, within a reasonable period of
time...Good faith is not enough, the plan must be realistic and feasible." Star Leslie at
143. The Respondent father's "plan" appears to be return to the Respondent mother after she
completes drug treatment and parenting skills. After six years of placement of the subject child in
foster care, that "plan" does not appear to be realistic. As the Legislature expressed in SSL
§ 384-b [1] [a] [iv], "when it is clear that the birth parent cannot or will not provide a
normal family home for the child and when continued foster care is not an appropriate plan for
the child, then a permanent alternative home should be sought for the child."
The Court must now consider the Respondent father's request for post-adoption rights to
visitation with the subject child. In a recent decision Referee Carol Goldstein granted standing to
seek Guardianship to a biological mother whose parental rights to the subject child had been
terminated. In Matter of Rasheed A. (NYLJ, August 8, 2007, at 27, col 1) Referee
Goldstein made her determination relying on the principle that a biological stranger has the right
to seek guardianship, the exceptional needs of the child and the birth mother's exceptional ability
to meet those needs, and the only other option would be placing the child in a locked facility, a
placement the child's forensic evaluator did not support. The Referee began her Conclusions of
Law with the citing of a series of cases, which found the biological parent lacks standing to seek
custody after his or her parental rights have been terminated, including Santosky v Roach
(161 AD2d 908 [3d Dept 1990], app dismissed 76 NY2d 981[1990]). Santosky
relied on the United States Supreme Court's statement that "(t)ermination denies the natural
parents' physical custody, as well as the rights ever to visit, communicate with or regain custody
of the child." in Santosky v Kramer, 455 US 745, 749 [1981]).[FN1]
Similar language is expressed by the Legislature in Domestic Relations Law (hereinafter
"DRL") §117 (1) (a) stating that the effect of adoption is to relieve the biological parent "of
all parental duties toward and all responsibilities for" the adopted child over whom the parent
"shall [*4]have no rights."[FN2] In Matter of Gregory B. (74 NY2d 77
(1989) reargument denied sub nom Matter of Willie John B., 74 NY2d 880 [1989], the
Court of Appeals acknowledged "the psychological harm that may possibly result from severing
the bonds between a child and his or her biological parent." Id at 90. However, the Court
of Appeals noted that "open" adoptions, "in which the court supplements an order of adoption
with a provision directing that the adopted child have continuing contact and visitation with a
member of his or her biological family" is inconsistent with DRL §117 [1] [a]. Gregory
B. at 91. The Court of Appeals found "open" adoptions were not authorized at that time and
that the Legislature "more appropriately should be called upon to balance social policy choices
and the delicate issues of family relations involved in such a determination." Id.
One year after Gregory B., SSL § 383-c was enacted, effective January 1,
1991, giving the birth parent who surrenders his/her child to an authorized agency for adoption
the right to reserve post-adoption visits or communications. Case law has held that this statute
must be read along with DRL §117. (See Adoption of Gerald T., 211 AD2d 17 [1st
Dept 1995]). SSL § 383-c carved out an exception to the general principles stated in DRL
§117. The Court may find the conditions attached to the surrender are not in the child's
best interest after a full evidentiary hearing and may disapprove the adoption. Gerald T.
at 512. Adoptive parents are free to elect to permit contacts between the adopted child and the
birth parent after termination of parental rights based on permanent neglect. (Gregory B.
at 91); (Matter of Jessi W., 20
AD3d 620 [3rd Dept. 2005]). However, in general, the Family Court does not have the
authority to order post-adoption visitation, as the legislature had limited the concept of "open
adoptions" to SSL § 383-c surrenders.
The First Department reversed post-adoption orders of visitation after the termination of
parental rights as "the Family Court in this matter lacked statutory authority to order
post-adoption visitation." Matter of April S. (307 AD2d 204 [1st Dept. 2003]). See
also Matter of Cheyanne M., 299 AD2d 162 [1st Dept 2002] holding "open
adoption" is not a dispositional option. The Court in April S. distinguished the Second
Department's decision in Matter of Corinthian Marie S. (297 AD2d 382 [2nd Dept.
2002]) that affirmed post-adoption visitation of the birth parent whose parental rights were
terminated on the basis of mental retardation, because of its "exceptional circumstances."
April S. at 205. In Corinthian the Second Department acknowledged that "(t)his
court has recognized that continued relations between a child and a natural parent may be in the
child's best interests even after adoption." The Court cited an early appellate division case that
stated "[t]he Supreme Court has ample power at law and in equity to promote the welfare of the
child, notwithstanding a legal adoption . . .and the power to permit and to regulate visitation on
the part of the mother is, of course, included." (Matter of McDevitt, 176AD 418, 423
[2nd Dept 1917]). The Court also cited a series of cases where visitation was allowed after the
termination of parental rights based on the birth parent's mental retardation or mental condition
pursuant to SSL § 384-b [6]. In Corinthian Marie S., the natural mother was
allowed two supervised visitations per year and to exchange correspondence and cards on [*5]holidays and the children's birthdays.
In Matter of Lovell Raeshawn McC. (308 AD2d 589 [2nd Dept. 2003]) the Second
Department held Family Court has no statutory authority to order continued visitation upon the
termination of parental rights based on abandonment citing Gregory B., supra. The court
in Lovell found the Family Court erred when it granted the birth mother's application to
permit the parents and a sibling to continue biweekly visitation as there is no statutory
authorization for a court to order continued visitation once a parent's rights are terminated under
SSL§ 384 [4] [b]. The Appellate Court took note that post-adoption visitation between
siblings was permissible pursuant to DRL § 72 and whether such visitation would be in the
subject child's best interests should be considered by the court hearing the adoption petition.
Most recently, the Second Department in Matter of Kevin W. v Monique T. (38 AD3d 672 [2nd Dept 2007]
lv denied 9 NY3d 803 [2007]) found that "upon the adoption of the subject child
following the determination that the petitioner's consent was not required (citations omitted), the
petitioner's parental rights ceased, and he lacked standing to prosecute a custody and visitation
petition" for the child, citing DRL § 117 [1] [a]. In addition, the Appellate Court held the
Family Court had "providently exercised its discretion" when it barred the birth parent from
petitioning for custody or visitation without the Court's written approval.
In the case at bar, the Putative Respondent father has failed to demonstrate a wish to take on
the role of fatherhood. His only contact with the child has been visitation. He has not shown the
"exceptional circumstances" shown in Matter of Corinthian S., supra where a
parent's rights are terminated on his/her mental condition that would support continued
post-adoption visitation as in the subject child's best interests. Thus, this Court does not have the
statutory authority to grant the Respondent father's request.
This is the decision and order of the Court. The matter is adjourned for the dispositional
hearing on the Respondent father's case and for continued fact finding and dispositional hearing
on the Respondent mother's case.
E N T E R :
_____________________________
HON. SUSAN S. DANOFF, J.F.C.
Footnotes

Footnote 1:The US Supreme Court held the
existing standard of proof of "fair preponderance" in FCA § 622 was a violation of the due
process clause. It is interesting to note that the same family was involved in each
Santosky proceeding. The Supreme Court had vacated the New York State Appellate
Division decision and remanded the proceeding for a hearing pursuant to a constitutionally
proper standard. Under a "clear and convincing" evidentiary standard the Santosky's
parental rights were terminated. The child was adopted but after problems arose in the new
family, the adoptive parents surrendered the child who was returned to the care of the
Department of Social Services. While the Department sought a "residential setting" for the child's
placement, the child absconded, and contacted his biological parents with whom he had not had
communication for eight years. The biological parents sought custody of the child and the
Appellate Division in Santosky v Roach affirmed the Family Court holding that natural
parents lacked standing to bring a custody proceeding. The Appellate Division, quoting the US
Supreme Court decision of eight years before, affirmed the Family Court holding that the
petitioners lacked standing to seek custody after the termination of their parental rights. "Lacking
any legal relationship that would give rise to a claim of custody, and with the child presently
under the jurisdiction of the (County Commissioner of the Department of Social Services),
petitioners have not demonstrated the necessary stake in this matter." Santosky v Roach,
161 AD2d 908, 909.

Footnote 2:In addition, DRL § 117
states that adoption terminates the rights of inheritance and succession between the child and his
birth parent(s), except when the adoptive parent is the partner of the birth parent, and begins such
a relationship between the child and the adoptive parent(s).